## UNITED STATES v. THE JAPANESE SCHOONER KENSEI MARU.

(Third Division.    Valdez.    October 4, 1909.)

No. 355.

1. FISH (§ 16*)—ILLEGAL SEALING—FORFEITURE.

A Japanese vessel, engaged in taking seals within one marine league of the Pribiloff Islands in violation of law, is within the jurisdiction of the district courts of Alaska, and subject to forfeiture.

[Ed. Note.—For other cases, see Fish, Dec. Dig. § 16.*]

2. FISH (§ 16*)—ILLEGAL SEALING—FORFEITURE.

The pleadings of the owner admitted that the crew of his vessel was convicted for illegal sealing within the jurisdiction of the United States. *Held*, the admitted conviction on the criminal case was sufficient to justify a forfeiture of the vessel for a violation of the law.

[Ed. Note.—For other cases, see Fish, Dec. Dig. § 16.*]

3. FISH (§ 16*)—ILLEGAL SEALING—FORFEITURE OF CARGO.

A Japanese schooner was arrested in the one marine league zone around the seal islands. Her crew was found guilty, and the vessel forfeited for illegal sealing. *Held*, that sealskins found on board the vessel were forfeited as part of the cargo.

[Ed. Note.—For other cases, see Fish, Dec. Dig. § 16.*]

C. D. Murane, U. S. Dist. Atty.

F. M. Brown, for claimant.

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

OVERFIELD, District Judge. The following important questions confront the Court: (1) Has this court jurisdiction in this cause? (2) Was the schooner seized by the authority of the United States within one marine league of the island of St. Paul? (3) Was the said schooner, at said time of its capture, engaged in illegal sealing? (4) Does the forfeiture of the schooner also work a forfeiture of the fur sealskins constituting a part of her cargo?

Anticipating, it is fair to assume that an affirmative answer to question No. 2 will be a conclusive answer to No. 1. Let us, then, proceed to the second interrogative.

The clear, concise evidence of the captain of the revenue cutter Bear, as well as that of its officers, is that on the early morning of July 22, 1908, the said revenue cutter Bear, under orders from the Treasury Department of the United States, on duty in the waters surrounding the seal islands, was anchored about two miles from the largest rookery on St. Paul Island, one of the well-known fur seal islands of the Pribiloff group, belonging to the United States, and about one-half to three-fourths of a mile off shore; that the anchor of the Bear was hoisted at about 4 a. m. of the morning of the 22d, and her course directed along and parallel to the said St. Paul Island, towards the northeast point thereof, on which is situate the above-named rookery. Whereupon a small sealing boat manned, was sighted while within the three-mile limit, which they proceeded to capture, in the meantime observing a schooner a little farther on, but within the three-mile zone. And while continuing on in her course to seize said schooner, a second schooner, the libeled vessel in this action, was sighted still farther on and within illegal sealing waters.

At that time, as afterwards estimated by Capt. Bertholf and his officers, from cross-bearings taken at the time the first schooner was seized, the said No. 2 Kensei Maru was from 1 to 1½ miles from the shore of the said island of St. Paul,

but that at the time the said No. 2 Kensei Maru was seized, she was 2⅜ miles from the said shore. There is no evidence to dispute this verified evidence and log of the revenue cutter Bear, entered at 9 a. m. on the morning of the 22d as to the position of the No. 2 Kensei Maru when so captured, other than the log of said schooner, which shows that on the previous evening at 6 o'clock it was from 8 to 12 miles off the northeast point of said island, and all the members of the crew who were called to testify agreed and admitted that the schooner had changed her position during the evening, which was calm and foggy, and seemed surprised to find themselves so near land when the fog lifted on the following morning about 5 a. m., after they had left the schooner in their small boats to hunt seals.

But the uncontradicted evidence shows that in the 12 hours elapsing from the time the above bearings by the navigating officer of the schooner were taken and the time of her seizure there had been practically no wind, with 7 hours of ebb and 5 hours of full tide, and at the time of her capture the tide was also ebb. This leads the court to the conclusion that, sometime during the night, this schooner must have received other aid than the natural elements in changing her position some 6 or 8 miles.

The evidence is uncontradicted that on the morning of the seizure at least six boats of the schooner had been ordered out sealing by the captain, some going inshore from the schooner, and that as soon as they saw the land and the Bear, at approximately the same time, they immediately returned to the schooner, and four of these small boats attached lines to the bow of the schooner under orders of its captain, and began pulling its bow away from the shore towards which she was pointing. Nor is the evidence denied that they succeeded, by assisting and towing, with one additional sail hoisted, in considerably widening the distance between the said schooner and the shore,

and that four blasts from the whistle of the Bear, as a signal for her to heave to, had no effect, but that a blank shot from the six-pounder was necessary to cause her to stop. Though these small boats, as well as the schooner, were equipped with nautical instruments, yet there is not a word of testimony given to show the position of the schooner on the said morning, other than the estimated distances of the crew, ranging from 3 to 5 miles from the shore, while some very frankly stated that they did not know whether they were within the limit or not. The court is therefore led to the belief, beyond a doubt, that the schooner No. 2 Kensei Maru, when seized by the revenue cutter Bear, was within one marine league of St. Paul Island, and within the Third judicial division of the territory of Alaska, and over which this court has jurisdiction.

To question 3 has been given no little argument and consideration, and I am not aware of a like case. The attorney for the claimant and owner denies the application of the general rule to the particular facts of this case, that a question once litigated in a court of competent jurisdiction is res adjudicata in a subsequent action between the same parties and their privies on the same question in the same court

The pleadings admit the conviction of the crew in this court on the criminal charge of illegal sealing, and the exhibits in said cause No. 139 clearly demonstrate that the only question involved, both in the indictment, trial, and instructions by the court to the jury, was:

"Did the defendants kill seals on the morning of their capture by the Bear within three miles of the shore of St. Paul Island?"

The question then arises:

"Is a conviction in a criminal case competent evidence in an admiralty cause?"

If an affirmative view of this question be taken, I can see no reason why the advantage, if any, is not with this claimant and owner.

In the criminal case the defendants were not convicted until the evidence convinced the jury, beyond a reasonable doubt; while admittedly in this admiralty cause the same rules as to the quantity and quality of evidence do not apply. And, had the verdict been one of acquittal in the criminal cause, this libel would undoubtedly have been dismissed upon the claimant offering such acquittal in evidence in this court in admiralty.

The forfeiture takes place, regardless of any question of intent on the part of any owner of the vessel, or her tackle or cargo, or any part thereof, or any intent therein. Therefore, although the vessel may be owned by the claimant and the cargo by the claimant and crew, the one is included in the forfeiture as well as the other.

It has been argued that the testimony as shown by the transcript as to the actual killing of seals by the crew of this schooner on the morning of July 22, 1908, is more or less circumstantial. To this I must agree. However, I am convinced that the facts sustained the verdict. In this case, the schooner, her apparel, etc., as well as her cargo, regardless of her ownership, is the offender under section 1956, Rev. St. U. S.

The master and crew of this schooner were admittedly working under hire and contract, and under orders from its owners, were provided with the tools, instruments, and paraphernalia to hunt fur seals, and, under the circumstances, I think they were responsible for the acts of their crew and master when so engaged in hunting fur seals, even when seized within the forbidden zone. And on the same reasoning the master and crew were privies to the claimant and owner under the general rule we are here discussing. So that the conviction of the crew in the criminal cause binds the claimant and owner in this case as to the point litigated in the former and now in question here; that is, the killing of fur seals by the crew of this schooner on the morning of July 22, 1908, within one marine league of the island of St. Paul.

The United States was a party plaintiff in the criminal case, as it is a party plaintiff here, and we have within the rule the same party and their privies here litigating the identical question formerly litigated and between the same parties and their privies in this same court. I therefore do not hesitate to hold that a former conviction in the criminal case in this court of the master and crew of the schooner No. 2 Kensei Maru binds the claimant and owner in this action, and that the fourth question is answered in the affirmative.

Well-known facts of natural history are within the judicial cognizance of this court, and it is a fact of natural importance and common knowledge in this territory that illegal sealing has existed for a long time and still exists to such an extent that recent investigations by the government officials disclose an appalling condition on the seal islands in this territory; that these valuable assets, for which Alaska has long been famous, and from which a revenue has been derived equaling the purchase price paid for Alaska to Russia, are fast disappearing because of this poaching.

To punish the crew alone of these schooners, found illegally sealing within the forbidden limits of these valuable seal islands, does not deter these depredations. Their incarceration in our local jails, given good food and a new suit of clothes at the end of their term of sentence, and transportation from the territory furnished at government expense, is to this class of seamen as a rule, to which may be said the gunners are an exception, an agreeable outing, to which they, as well as their friends and acquaintances, seem quite willing to expose themselves.

The owners of these vessels, who benefit most from this illegal sealing, should be punished for this illegal occupation, as well as the crew, who receive but a small portion of the value of each skin captured. What has been said above in relation to the schooner and its owners applies with more than

equal force to the cargo, consisting of these coveted and valuable sealskins.

Thus we arrive at the fourth question. On the schooner No. 2 Kensei Maru, when seized, were 416 fur sealskins. The interest of the crew in these fur sealskins, constituting the cargo, as well as the reward for their industry and effort, is 6 yen, or $3, each to the gunners (two alone receiving 7 yen, or $3.50), and 12½ cents each to the rest of the crew. Each small boat is manned with one hunter, who does the killing, and three helpers, two at the oars and one at the helm.

The attorney for the claimant and owner strongly urges that under section 1956 the fur sealskins constituting the cargo of this schooner cannot be forfeited to the United States. He would sustain his argument by the decision of Judge Hanford in the case of United States v. The James G. Swan et al. (D. C.) 77 Fed. 473, in which case 53 sealskins, found on board the schooner Swan when seized, and afterwards condemned and forfeited, were held by this eminent judge to be not forfeited.

However, it may be noted in connection therewith, as set out in the brief by the District Attorney, that Judge Hanford was proceeding under Act Cong. April 6, 1894, c. 57, § 8, 28 Stat. 53 (U. S. Comp. St. 1901, p. 3008), which reads:

"All vessels, their tackle, apparel, furniture, and cargo at any time used or employed in violation of this act, or of the regulation made thereunder, shall be forfeited to the United States."

Under section 1956 the language is:

"All vessels, their tackle, apparel, furniture and cargo, found *engaged in* violation of this section, shall be forfeited."

I am frank to admit that I can see but little, if any, distinction between the different words employed in these two sections, and that they are, as commonly used, more or less synonymous. But it is patent that the phrase "engaged in," in section 1956, under which we are proceeding in this cause,

means a cargo of fur skins; otherwise, the object of the statute, to stop and prevent illegal sealing within the forbidden zone of the waters of Alaska, is defeated.

The primary and sole purpose of the cruise of the No. 2 Kensei Maru was to obtain sealskins, and the success of the enterprise was dependent upon obtaining a cargo of these skins

The vessel, her tackle, apparel, and furniture, were necessary instrumentalities in the actual killing of the seals. The cargo to be obtained was necessary to finance the enterprise. When reduced to its ultimate bearing on the transaction, the cargo itself, consisting of fur seals, is as indispensable to the success of the enterprise as the gun with which the seals were killed.

The cargo is clearly and intimately involved in every phase of the transaction. It cannot be reasoned that this cargo was a thing apart from the rest of the vessel, its apparel, and equipment, other than in name, and that this act especially designated it a cargo to include it within the penalty.

There is no doubt but that, in such a judicial proceeding to condemn and forfeit property, this section of our statute must be strictly construed. But the intent of Congress in making the same a part of our law, and the interpretation of the word "cargo," taken in connection with the rest of the sentence in section 1956, may lead to different conclusions.

These skins provide the pay for the crew, their supplies, guns, ammunition, and profit to the owners, and were as much engaged in the violation of the law on July 22, 1908, as the vessel itself; the one providing sustenance and reward, and the other transportation.

Congress provided that the cargo, in addition to the tackle, apparel, and furniture of a vessel, should be forfeited. And it appears they might well have had in contemplation at the time this very question, and intended that the forfeiture should include the skins and anything else constituting such a cargo.

I cannot believe Congress had in mind a different cargo when section 1956 was enacted. And if it be otherwise, and these fur sealskins be held exempt, and the crew rewarded therefrom in proportion, in addition to the more or less 300 pleasant days spent in the custody of the United States at Valdez, then I can foresee constant repetition of these illegal acts and the very purpose and object of the section defeated. I decline to put such a construction upon the section in question, or reach such a conclusion therefrom in this case.

Therefore let findings of fact and conclusions of law be drawn, and a decree be prepared to be signed accordingly.